**E-Filed 04/09/08**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| MICHAEL JOHN YANCEY, | Case No. C 05-1028 JF |
| Petitioner, | ORDER[1] DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| JEANNE S. WOODFORD, Director of the California Department of Corrections, and CHARLES HARRISON, Warden of the California State Prison, Los Angeles County, | |
| Respondent. | |

## I. INTRODUCTION

On December 18, 2000, Petitioner Michael John Yancey ("Yancey") was convicted of first degree murder (Cal. Penal Code § 187) in the Santa Clara Superior Court. On February 8, 2001, the trial court sentenced Yancey to an indeterminate term of 25 years to life in state prison. Yancey appealed. On September 23, 2003, the California Court of Appeal affirmed the conviction. On October 15, 2003, the California Supreme Court denied review.

Yancey now seeks relief in this Court, alleging that the state trial denied him his federal

---

[1] This disposition is not appropriate for publication and may not be cited.

1  right to due process and a fair trial under the Fifth, Sixth and Fourteenth Amendments.  Yancey

2  claims that the state appellate applied a standard of review that is patently contrary to clearly

3  established federal law in concluding that certain constitutional violations were harmless and that

4  other errors did not amount to constitutional violations at all.  For the reasons set forth below,

5  this Court concludes that Petitioner's federal habeas claims are without merit and will deny

6  relief.

## II. BACKGROUND

The state appellate court summarized the relevant facts as follows:

At the time 42-year-old Kenneth Alexander was stabbed to death on April 13, 1999, he was 6 3 and weighed 328 pounds.  He and his friend, James Fincher, Jr., were members of San Jose's gay community but were not a couple.  Alexander did not have a boyfriend and did not actively pursue relationships; "self conscious about his weight," he was a quiet "loner" who seldom tried to "pick[] up" people. Alexander's father testified that Alexander never had mentioned that anyone had struck him, that he was afraid of anyone, or that he owed money to drug dealers.

* * * *

Between 10 and 10:30 p.m. on April 11, Fincher came to Alexander's apartment, where both drank margaritas and used methamphetamine.  After Alexander injected the drug, he became "energetic" and started cleaning his apartment.  He cleaned all the dishes, including the margarita glasses.  When they became "bored," they decided to "take off."  When they left, the apartment was "pretty spotless."  Between 1:00 and 1:30 a.m. on April 12, they set off for San Francisco, intending to go to gay-friendly bars in the Castro district, but the bars were closed when they arrived between 2:30 and 2:45 a.m.  At Fincher's suggestion, they went to Collingwood Park, an area where gay men buy methamphetamine or "pick up on other gay guys."  There is a homeless shelter on the corner of the park.

Fincher and Alexander parked on Collingwood, sat outside the car, and talked.  After about a half hour, they saw defendant Yancey coming up the street. Yancey, who was "white," was spitting and appeared to have "cotton mouth," a side effect of methamphetamine use.  Alexander walked over to Yancey and offered him water.  The two men talked and then joined Fincher. Alexander introduced Yancey as "Mike."

Alexander asked if Yancey "wanted to get high."  Yancey accepted.  The three men decided to get a hotel room.  Fincher testified that, by 4:30 a.m., they had found a room at a Travelodge, although the receipt recovered from Alexander's apartment showed a check-in time of 5:22 a.m.  While Alexander registered, Yancey told Fincher that he and his lover were staying at the shelter and were leaving later that day for Los Angeles.

In the hotel room, Alexander injected more methamphetamine while the other two smoked the drug.  All three undressed, and Yancey and Alexander had "mutual and voluntary" unpaid-for sex . . . .  Yancey said he needed to be at the shelter by 8 a.m. because he "didn't want his lover to get worried."  Yancey mentioned that his lover was "black" and a transvestite.  When the three drove to the shelter, Yancey asked Alexander for $40 for "gas money" for his trip.  Alexander said he did not

28

2

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
Case No. C 05-1028 JF
(JFEX2)

have any money, and Yancey "just said he'd get it some other way." Alexander invited Yancey and his lover to visit in San Jose to "hang out and party again." He wrote his address and the security code to call his apartment on a business card and gave it to Yancey.

After dropping off Yancey, Fincher and Alexander drove around the city before returning to the hotel room to pack. At one point, Alexander looked under the bed for a pack of cigarettes he had misplaced; instead, he found a black suitcase. He and Fincher examined it [sic] contents, which included a shaving kit, a date book, identification, passports, credit cards in the name of David C. Quinn, an envelope that contained $8,000 in U.S. currency packaged in $2,000 bundles and wrapped in bank wrappers, Indonesian bank notes in 500 rupiah denominations, plus two wrinkled $100 bills that were thrown in the suitcase.

* * * *

Defendant Michael Yancey, who was 20 years old at the time of trial, testified on his own behalf as follows.

Soon after Yancey met defendant Ronnie Ellard in Hollywood, California, in late January 1999, they began a romantic relationship. . . .

Yancey and Ellard had little income. They had no permanent residence but moved between residential hotels. Ellard received monthly social security disability payments after being diagnosed with AIDS, while Yancey earned income by having sex with older men for money and occasionally by selling drugs. . . .

Yancey and Ellard drove to San Francisco in search of better social services and housing for AIDS patients. However, during their four-to-six week stay there, they had difficulty finding residential hotels in which to live.

On one occasion, the couple stayed at a men's shelter. They arrived there at approximately midnight. Yancey played cards with the staff and waited for Ellard to fall asleep. Yancey then went to Collingwood Park in hopes of making money from prostitution. Yancey was under the influence of methamphetamine there when he saw two men leaning against an LTD Crown Victoria. Alexander stepped forward, offered Yancey water, and asked if he wanted to get high. When Yancey said, "Hell yeah," Alexander said they would look for a hotel room. They walked to Alexander's car, where Yancey met Fincher.

The three went to a Travelodge, where they used methamphetamine and had sex. After about three hours, Yancey said he needed to return to the shelter. En route to the park, Yancey asked for $40 gas money to get to Los Angeles. Alexander said he had no money to spare but invited Yancey and his lover to spend the night on their way to Los Angeles. Alexander wrote down his name and partial directions to his apartment, and he gave the information to Yancey. Yancey felt Alexander "seemed lonely" even though he was with a friend.

At the shelter, Yancey and Ellard argued about Yancey's absence. Around noon, Yancey met a young girl named "Nicole" in front of the shelter. After introducing her to Ellard, Yancey invited her to accompany them to Los Angeles. Later that day, the three began their trip, and Yancey and Ellard agreed to stop to see Alexander. At about 4 p.m, they called Alexander for directions. When they arrived, Alexander buzzed them through his apartment complex's security gate.

* * * *

Later, Yancey accompanied Alexander to his bedroom where Alexander began to tell Yancey about the money he had found at the hotel. As Alexander was talking, Ellard walked into the room. Alexander then told Ellard the story of how he found the bag. He showed Yancey and Ellard the money and asked, "What do you think I should do with it?" Yancey testified that Alexander did not give any money

3

to either Ellard or himself.

Alexander arranged for his guests to stay the night at Valley Park Hotel. . . . Alexander arrived between 9:00 and 9:30 p.m., accompanied by Yancey, who was wearing a baseball cap. . . . Yancey tried to register but could not because he lacked picture identification, and Alexander was hesitant about using his credit card to pay. . . . Alexander said they would get the money and return. . . . Within an hour, they all returned, and Yancey appeared to be under the influence of a stimulant. Ellard, who did not appear under the influence, registered and paid for the room int twenty-dollar bills. They were assigned to room 211, and billing records showed a check-in time of 10:57 p.m.

* * * *

Valley Park billing records show that a seven-minute phone call was made from room 211 to Alexander's residence at 2:12 a.m. on April 13.

At approximately 3:30 a.m. on April 13, Ellard called 911 from Alexander's apartment. He said someone had been stabbed and was bleeding, but he denied knowing who the victim was. When asked who stabbed the victim, Ellard said the victim "took some money that belonged to a dope dealer, so I think they robbed him." After asking for an ambulance, Ellard hung up.

A minute later, Officer Todd Carpenter responded to the 911 call that a person had been stabbed at 1324 South Winchester Boulevard, apartment 175. Carpenter arrived within two minutes but could not get through the complex's security gate for several minutes, although there is nothing to prevent a pedestrian from walking in when the gate opens. Once inside, Carpenter and other officers went to Alexander's apartment. The door was wide open, and the lights were on. They found Alexander on his knees, slumped over his bed, face down, unconscious with a faint pulse; according to Carpenter, there were no weapons at the scene, and it was not "readily apparent" whether Alexander had been "shot or stabbed" or "what had happened to him," although there was a lot of blood. At 3:42 a.m., Carpenter requested paramedics, who quickly transported Alexander. . . .

* * * *

Alexander's apartment showed no signs of forced entry, and no signs of a struggle, although a plant stand had been knocked down in the front entry. When Carpenter first arrived, a pair of athletic shoes appeared to be holding the door to the apartment open. All of the rooms except the kitchen and bathroom were lit. Nothing was "obviously missing," except for the handset transmitter for the base to the portable telephone on the bedroom dresser, and that handset never was recovered. Alexander's wallet and some cut limes were on the kitchen counter. The police did not locate the $8,000 that Alexander had found. There were used drinking glasses and dishes in the sink, and an empty tequila bottle was among the various items in the kitchen trash. Bloodstained cotton swabs, tissues, and the backing of a band-aid, as well as one drop of blood, were found in the bathroom. A "wadded up" blood soaked T-shirt was found stained in a manner consistent with it having been used to hold over a wound. A 40-ounce uncapped bottle of St. Ides malt liquor that was no more than a quarter full was found on the bedroom dresser. A Safeway receipt from "10:26 p.m." on "4-12-99" was found on the bedroom desk. Among the grocery items purchased at the time were grapefruit juice, orange juice, sodas, "Jose Quervo," Tostitos chips, and chocolate. Two small cotton balls and a small amount of off-white power that contained methamphetamine were located on the desk computer keyboard. Both bedroom closet doors were open, and the closet area looked like it had been "ransacked." A fitted red Nike baseball cap, size seven, was found on the floor under the pillows on the left side of the bed. An unopened condom was on the floor near the dresser.

4

* * * *

During the investigation of Alexander's death, Yancey's fingerprints were located in Alexander's car on the glass of the passenger front door and in Alexander's apartment on the St. Ide's beer bottle and on a colored water goblet in the kitchen sink. Alexander's print was located on the same glass goblet. The goblet was the type Alexander used to serve margaritas, and Fincher had used such a glass there on the evening of April 11. Both Alexander's and Yancey's prints were also located on the Q-tip holder in Alexander's bathroom. Yancey's DNA was found on the open St. Ide's bottle, and Yancey was identified as a possible contributor of DNA found on the baseball cap found on the bedroom floor.

On April 20, Alexander's father found a black bag in the back of the top shelf of his son's pantry. Inside, he found various items, including a passport and credit card belonging to David Quinn, but there was no money. The bag was given to police.

On June 6, the Los Angeles Police Department contacted San Jose Sergeant Mark McInich and informed him that Yancey was in custody in Los Angeles on an unrelated matter. When McInich attended Yancey's appearance in Beverly Hills Municipal Court on June 7, he saw Ellard in the courtroom and arrested him. At the time, Ellard's purse contained Indonesian currency in 500 rupiah denominations and a bill of sale for a 1986 Cadillac De Ville purchased on April 13. Police seized that Cadillac from the parking lot outside the court.

* * * *

Sergeant Pete Ramirez helped transport Yancey to San Jose by car on June 7. He had a tape recorder going during the trip in order to document any conversations that involved Yancey. Ramirez testified he and Yancey engaged in general "friendly" conversation during the trip, but he did not discuss Yancey's case at any point. Yancey mentioned that he was a prostitute and that he preferred methamphetamine to cocaine but used both, that he spent no more than $40 a day for methamphetamine, that when he previously had been "on cocaine he'd be between 200 and 400 dollars a day," and that he was using methamphetamine until his arrest. Ramirez testified that, when the other officers left the car at a gas station, Yancey said, "I'm pretty much fucked, huh, Pete?" Ramirez said Yancey indicated he was concerned he and Ellard would be separated while in jail. . . .

* * * *

McInich interviewed Ellard on June 7 after admonishing him pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Ellard described a four-day trip to Mendocino during which he visited his mother. He said he went to San Francisco during that same trip for "A.I.D.S.-related treatment," he stayed at a shelter near Collingwood Park and he met a teenager named Nicole. Ellard also talked about visiting a friend named Ken. Ellard said he first met Ken at a Travelodge in San Francisco. Ellard later said they first met at Ken's San Jose Apartment and that Nicole was there as well. Ellard said he prepared dinner there, and he described seeing stacks of money held together with clips and rubber bands "stacked around" Ken's apartment. According to Ellard, Ken was afraid of a Hispanic individual who had accused him of stealing $8,000. Ellard added that, during one of his repeated visits to Ken's apartment, he had seen a tall, skinny white male get into an argument with Ken outside his apartment building and strike Ken. Ellard said Ken later helped him and Nicole get a motel room, that he and Nicole spent the night there, and that, at one point, Ken came to their room because he was afraid of the Hispanic male. Ellard said he initially allowed Ken to stay but eventually asked him to leave because he was looking out of windows, making too much noise and disturbing other people. Told that his voice had been recorded on the tape of the 911 call from Alexander's

5

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
Case No. C 05-1028 JF
(JFEX2)

apartment, Ellard admitted having made that call but denied being present when Alexander was hurt.  Ellard said he and Nicole had been sitting in their car outside Alexander's apartment building when Ellard got a "bad feeling" and thought the skinny white male was in the apartment.  Nicole waited in the car while Ellard went to the apartment and discovered Alexander lying partially on the bed and wheezing.  Ellard used Alexander's telephone to call 911 and then left the apartment.  Ellard said that, as he left, he saw the skinny male who had argued with Ken earlier.  Ellard told McInich he saw the police arrive and then immediately drove to Los Angeles with Nicole.  Ellard also told McInish that he had "flushed" all the information that he had had regarding Alexander.

Ellard later told McInish he wished to "withdraw" his statement.  He said a physician told him he was suffering from dementia and should not make statements without assistance.  He added that he was concerned he may have provided information harmful to himself.

* * * *

At trial, Yancey provided the following testimony in support of his alibi defense.

Alexander helped Yancey and Ellard carry their bags to the room at Valley Park; he did not stay, but gave Yancey a hug and said, "Stay in touch."  Yancey and Ellard then argued because Yancey did not get any money from Alexander.  Yancey took a shower, had sex with Nicole, and fell asleep with her.  He testified he was unaware of anything unusual happening that night. . . .

The next morning, Ellard, Yancey, and Nicole drove to Los Angeles.  Yancey testified he slept through the trip.  After checking into a hotel in Los Angeles, he and Ellard went to a car dealership where Ellard traded in his car for a Cadillac.  Aware the Cadillac had cost approximately $1,300 more than Ellard's current car, Yancey asked where Ellard got the money for the trade-in.  Ellard said, "It's none of your business.  You plan on leaving me anyway."  In the following days, Ellard bought several new outfits and had breast surgery.  Yancey testified he suspected Ellard's money was "ill-gotten" and came from Alexander.

*People v. Ellard*, 2003 WL 22183671 *1-8 (Cal. Ct. App. 6th Dist. 2003).

## II. LEGAL STANDARD

Because it was filed after April 24, 1996, the instant petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA),[2] which imposes significant restrictions on the scope of federal habeas corpus proceedings.  Under AEDPA, a federal court may not grant habeas relief with respect to a state court proceeding unless the state court's rulings were "contrary to, or an involved an unreasonable application of" clearly established law as articulated by the United States Supreme Court, 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts, 28 U.S.C. § 2254(d)(2).  A state court's decision is

[2] P.L. 104-132, 110 Stat. 1214.

6

1  "contrary to" law if the state court arrives at a conclusion opposite to that reached by the

2  Supreme Court on a question of law, or reaches a different conclusion based on facts materially

3  indistinguishable from those of a Supreme Court case. *Williams v. Taylor*, 529 U.S. 362, 412

4  (2000).  A state court's decision constitutes an "unreasonable application" of Supreme Court

5  precedent if the state court identifies the correct governing legal principles, but the application of

6  the law to the facts is objectively unreasonable. *Id.*  The federal court does not substitute its own

7  judgment for that of the state court; rather, it must conclude that the state court's determinations

8  were "clearly erroneous." *Van Tran v. Lindsey*, 212 F.3d 1143, 1153-54 (9th Cir. 2000).

9  ### III. DISCUSSION

10  **A.**   **Failure to Grant Petitioner's Motion for Severance**

11       A federal court reviewing a state conviction under 28 U.S.C. § 2254 does not concern

12  itself with state law governing severance in state trials nor does it consider procedural rights to

13  severance afforded in federal trials. *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997).  Its

14  inquiry is limited to a petitioner's right to a fair trial under the Constitution, laws or treaties of

15  the United States. *Id.* (citing *Estelle v. McGuire*, 502 U.S. 62, 68 (1991)).  The question for the

16  court is "whether the state proceedings satisfied due process." *Grisby*, 130 F.3d at 370.  To

17  prevail, a petitioner must demonstrate that the state court's denial of his severance motion

18  resulted in prejudice great enough to render his trial fundamentally unfair. *Id.*  "This prejudice is

19  shown if impermissible joinder had a substantial and injurious effect or influence in determining

20  the jury's verdict." *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000).

21       Yancey sought a separate trial on two grounds: (1) in a joint trial, admission of Ellard's

22  statements to the police implicating Yancey would violate Yancey's Sixth Amendment right to

23  cross-examination under the *Aranda-Bruton* rule; *People v. Aranda*, 63 Cal. 2d 518, 528-30 (Cal.

24  1965) (finding that it may be a denial of due process to rely on a jury's presumed ability to

25  disregard a codefendant's confession implicating another defendant when it is determining that

26  defendant's guilt or innocence); *Bruton v. United States*, 391 U.S. 123, 135-36 (1968) (finding

27  that admission of codefendant's confession that implicated defendant at joint trial constituted

28

7

1    prejudicial error even though the trial court gave clear, concise and understandable instruction

2    that the confession could only be used against codefendant and must be disregarded with respect

3    to the defendant); and (2) separate trials were necessary to balance Yancey's right to present a

4    defense with Ellard's right to not have prejudicial evidence of his prior felony convictions and

5    criminal conduct admitted. *Ellard*, 2003 WL 22183671 at *17.

6    _____ In denying Yancey's motion for severance, the state trial court noted that evidence of

7    Ellard's proclivity toward violence would not have been admissible even if the Yancey and

8    Ellard were granted separate trials. *Ellard*, 2003 WL 22183671 at *18. Contrary to Yancey's

9    contentions, the evidence could not be admitted to show either identity or common scheme or

10   plan. *Id.* The trial court determined that "the proffered evidence would not be admissible to

11   prove common plan or scheme since there was nothing 'unique' about what happened in the

12   present case that would give rise to admitting evidence that Ellard had been involved in a similar

13   common plan or scheme in the past," and "the evidence of Ellard's prior misconduct was not

14   sufficiently similar to the evidence surrounding the stabbing of Alexander to warrant

15   admissibility on the issue of identity." *Id.* With respect to Ellard's statement to police, the trial

16   court ordered the statement to be redacted so that it did not contain any reference to Yancey and

17   no inference could be drawn that any statement was made incriminating him. *Id.*

18        The state appellate court reviewed the trial court's ruling for abuse of discretion. *Id.* at

19   *17. The court held that "the trial court did not abuse its discretion by ruling that Ellard's prior

20   convictions and misconduct would be inadmissible to prove identity or common plan or scheme

21   in a separate trial for Yancey, and that . . . the court had devised a reasonable solution to

22   Yancey's *Aranda-Bruton* concerns by redacting Ellard's statement to eliminate all references to

23   Yancey." *Id.* at *19.

24        While this Court may not review the foregoing application of state law, it may evaluate

25   "whether the state proceedings satisfied due process." *Grisby*, 130 F.3d at 370. Where a motion

26   for severance is denied, "the reviewing court may nevertheless reverse a conviction, where,

27   because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of

28

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
Case No. C 05-1028 JF
(JFEX2)

1    a fair trial or due process of law." *Turner*, 37 Cal. 3d at 313.  Yancey bears the burden of

2    demonstrating that the state court's denial of his severance motion resulted in prejudice great

3    enough to render his trial fundamentally unfair, *Grisby*, 130 F.3d at 370.  He must show that the

4    failure to sever had a substantial and injurious effect or influence in determining the jury's

5    verdict. *Sandoval*, 241 F.3d at 772.  In other words, Yancey must establish that the error resulted

6    in "actual prejudice." *See Brecht*, 507 U.S. at 637.  For the reasons set forth below, Yancey fails

7    to meet this burden.

8    **B.     Claim that Joint Trial Resulted in a Denial of a Fair Trial**

9            Yancey claims that he was denied a fair trial because the joint trial resulted in a

10   deprivation of his Fifth and Sixth Amendment rights and his right to federal due process.

11   However, in *Chapman v. California*, 386 U.S. 18 (1967), the United States Supreme Court found

12   that a constitutional error does not automatically require reversal of a conviction.  Instead, a

13   harmless-error analysis is applied to a wide range of constitutional errors, most of which are

14   found to be harmless. *Arizona v. Fulminante*, 499 U.S. 279 (1991).  Harmless-error may be

15   applied to "'trial error' - error which occurred during the presentation of the case to the jury, and

16   which may therefore be quantitatively assessed in the context of other evidence presented in

17   order to determine whether its admission was harmless beyond a reasonable doubt." *Id.* at 307-

18   08.

19           Noting that it had been asked to consider several trial errors, the state appellate refused to

20   engage in a separate harmless error analysis regarding each individual act of alleged misconduct.

21   *Ellard,* 2003 WL 22183671 at *22.  Instead, it reviewed each of Yancey's interrelated claims of

22   error to consider whether the failure to sever, based on all the factors, ultimately resulted in a

23   denial of Yancey's constitutional right to a fair trial. *Id.*

24           1. Confrontation Clause Error

25           The confrontation clause of the Sixth Amendment provides that "[i]n all criminal

26   prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

27   him."  The right of confrontation includes the right of cross-examination. *Pointer v. State of*

28

9

1    *Texas*, 380 U.S. 400, 406-07 (1965).

2         Yancey argues that his right to confront the witnesses against him was violated when,

3    during closing arguments, counsel for Ellard relied upon Ellard's redacted statement in an

4    attempt to convince the jury that Ellard was trying to conceal Yancey's guilt.  Ellard's post-arrest

5    statement to McInich contained a fairly lengthy description of Ellard's relationship with Yancey.

6    The statement included a description of the meeting between Ellard, Yancey and Alexander and

7    an acknowledgment that, consistent with Yancey's testimony at trial, Ellard and Yancey both

8    visited Alexander's apartment on the afternoon of the murder.  Contrary to Yancey's testimony,

9    however, Ellard claimed that in the early morning of April 13, he drove to Alexander's apartment

10   and waited outside while Yancey went up to Alexander's apartment alone.  Ellard also stated that

11   after finding Alexander and calling 911, he saw Yancey running from the apartment complex.

12   The trial court's solution was to redact Ellard's statement to omit all references to Yancey and to

13   provide instructions to the jury that the redacted statement was inadmissible against Yancey.

14        The state appellate opined that a defendant's rights under the Confrontation Clause are

15   not violated by admission of a codefendant's confession that has been redacted "to eliminate not

16   only the defendant's name, but any reference to his or her existence," even though the confession

17   may incriminate the defendant when considered in conjunction with other evidence properly

18   admitted against him." *Ellard,* 2003 WL 22183671 at *20.  However, the court acknowledged

19   that "Ellard's counsel improperly relied upon Ellard's redacted statement to prove that Ellard was

20   trying to conceal Yancey's guilt." *Id.*

21        2.    <u>*Griffin* Error</u>

22        *Griffin v. California*, 380 U.S. 609, 615 (1965) forbids a prosecutor from arguing that a

23   defendant is guilty because he has chosen not to testify.  At trial, the prosecutor argued that if

24   Ellard were guilty and Yancey were innocent, Ellard would have no reason to "sit silently and let

25   the love of [his] life be falsely accused" *Ellard,* 2003 WL 22183671 at *23.  In reviewing the

26   trial court proceedings, the Court of Appeal found that:

27        [t]he prosecutor's remarks constitute misconduct with regard to Yancey because
          Ellard's refusal to testify, like Ellard's out-of-court statements, had no probative

28
                                              10

value as to the issue of Yancey's guilt and because the prosecutor was well aware
that Ellard most likely had chosen not to testify in light of the trial court's pretrial
ruling that some of his prior felony convictions would be admissible as impeachment
should he testify.

*Id.*

### 3.   Harmless Error Determination

Having found that the trial court did not abuse its discretion in denying Yancey's motion

to sever his trial, the state appellate court next analyzed whether the errors that occurred as a

result of the joint trial deprived Yancey of his constitutional right to a fair trial.  It looked "to the

evidence actually introduced at trial to determine whether 'a gross unfairness ha[d] occurred such

as to deprive the defendant of a fair trial or due process of law.'"  *People v. Bean*, 46 Cal. 3d 919,

940 (Cal. 1988) (quoting *People v. Turner*, 37 Cal. 3d 302, 313 (Cal. 1984)).  In doing so, the

Court of Appeal found that:

> Based solely upon the evidence properly presented against Yancey, there was
> overwhelming evidence that Alexander was anticipating a social encounter with
> Yancey, not Ellard, in the middle of the night, that it was Yancey who made the
> several minute telephone call to Alexander at 2:12 a.m. on April 13 to set up that
> tryst, and that Alexander buzzed Yancey into the apartment complex and left his
> apartment door propped open in anticipation of Yancey joining him.  The physical
> evidence found in Alexander's apartment after the murder, combined with the
> evidence from Fincher regarding Alexander's meticulousness, revealed that Yancey
> had been present in the apartment with Alexander *after* Yancey checked into the
> hotel and that Yancey had spent some time drinking in Alexander's apartment shortly
> before Alexander was stabbed.  Based upon the admissible evidence against Yancey,
> including his post-arrest letters to Ellard, it was virtually indisputable that Yancey
> entered Alexander's apartment in the middle of the night with the intent to rob
> Alexander of the money Alexander had found in San Francisco, that Alexander was
> killed during that robbery, that Ellard was, at a minimum, present in the apartment at
> the time of the stabbing and had called 911 when it appeared that Alexander
> might die from his wounds, that both Yancey and Ellard fled to Los Angeles later that
> morning with the proceeds of the robbery, and that Yancey actively participated in
> Ellard's purchase of the Cadillac shortly after they arrived in Los Angeles.
> Having reviewed the evidence actually adduced at trial, we find "neither
> actual nor potential prejudice such as to render Yancey's trial grossly unfair and thus
> deny due process."  *People v. Bean*, 46 Cal. 3d 919, 940 (Cal. 1988).  The admissible
> evidence against Yancey provided extremely strong and persuasive evidence of his
> guilt with regard to the Alexander felony-murder and no spillover effect of the
> inadmissible evidence could have affected the verdict rendered as to Yancey.

*Ellard*, 2003 WL 22183671 at *26-7.  The Court of Appeal's decision is not contrary to or an

unreasonable application of Supreme Court precedent.  It correctly applied *Arizona v.*

*Fulminante*, 499 U.S. at 307-308, in finding that the trial court's errors, when quantitatively

11

1    assessed in the context of other evidence presented, was harmless beyond a reasonable doubt.

2    **C.    *Doyle* Error**

3          The prosecution's use for impeachment purposes of a defendant's post-*Miranda* silence is

4    a violation of due process. *See Doyle v. Ohio*, 426 U.S. 610 (1976). *Doyle* error fits squarely

5    into the category of constitutional violations characterized by the Supreme Court as trial error.

6    *See Arizona v. Fulminante*, 499 U.S. at 307. However, when evaluating *Doyle* error, this Court

7    does not apply the harmless-error test articulated in *Chapman*. Instead, the Supreme Court has

8    established that the proper standard for review of *Doyle* error is whether the error "had

9    substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v.*

10   *United States*, 328 U.S. 750, 776 (1946). The Supreme Court found that the *Kotteakos* harmless-

11   error standard is best tailored to the nature and purpose of review and that the application of this

12   less onerous standard promotes the considerations underlying habeas jurisprudence. *Brecht v.*

13   *Abrahamson*, 507 U.S. 619, 623 (1993). Moreover, a *Doyle* error occurs during the presentation

14   of the case to the jury and is amenable to *Kotteakos* harmless-error analysis because it may be

15   assessed quantitatively in the context of other evidence to determine its effect on the trial.

16   *Arizona v. Fulminante*, 499 U.S. at 307-308.

17         Yancey argues that he asserted his right to remain silent during his initial interrogation by

18   San Jose police officers but that at trial the district attorney clearly and repeatedly questioned

19   Yancey about his refusal to protest his innocence to the officers. The state appellate court

20   concluded that no constitutional error had occurred because the prosecutor introduced Yancey's

21   incriminating statements to police Officer Ramirez ("Ramirez") only in order to compare it to

22   various exculpatory statements Yancey could have made instead. *Ellard*, 2003 WL 22183671 at

23   *30. Although Yancey alleges that the state appellate court misapplied the facts in this instance,

24   mistakenly concluding that the prosecution was commenting not on his initial silence but on his

25   subsequent statements to Ramirez, this Court finds no evidence to support that assertion.

26   Moreover, even if there was *Doyle* error, it is harmless under *Kotteakos*. In light of the strength

27   of the other incriminating evidence introduced at trial, Yancey cannot prove that the prosecutor's

28

                                                    12

1   statements had a "substantial and injurious effect or influence in determining the jury's verdict."

2   *Kotteakos*, 328 U.S. 750, 776 (1946)

3   **D.   *Miranda* Violation**

4   Yancey claims that the state appellate incorrectly determined that he had waived his

5   *Miranda* rights during his conversation with Ramirez in the car between Los Angeles to San

6   Jose.  Yancey asserts that he did not waive his *Miranda* rights and that Ramirez engaged him in

7   an interrogation that Ramirez knew was reasonably likely to evoke an incriminating response.

8   Yancey claims that Ramirez's questioning was persistent, involved criminal activity, bore

9   directly on the alleged motive for the murder, and carried immense potential for purposes of

10  impugning Yancey's character.  At trial, Ramirez introduced statements made in the course of the

11  conversation that, according to Yancey, were admitted under an unreasonable application of

12  *Miranda* and its progeny, thereby substantially prejudicing Yancey's defense.

13  In reviewing the evidence admitted at trial, the state appellate determined that Ramirez

14  did not engage Yancey in conversation and that Yancey did most of the talking.  While Ramirez

15  asked questions, they were follow-up questions to statements volunteered by Yancey.  Ramirez

16  did not speak about Yancey's case and was in fact unfamiliar with the facts of the case.  During

17  cross-examination, Yancey conceded as much.  Moreover, the state appellate found that

18  Ramirez's questions regarding Yancey's drug use were not objectively likely to elicit

19  incriminating statements with respect to the charged crime.

20  Before a person in custody may be interrogated, he must be informed of his rights to

21  remain silent and to have counsel present.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  In

22  addition, he must knowingly, voluntarily, and intelligently waive those rights for his post-

23  warning statements to be admissible against him.  *People v. Bradford*, 14 Cal. 4th 1005, 1032-

24  1034 (Cal. 1997).  Interrogation consists of words or actions on the part of the police that they

25  should know are "reasonably likely to elicit an incriminating response."  *Rhode Island v. Innis*,

26  446 U.S. 291, 301 (1980).  The trial court held that the admission of the statements did not

27  violate Yancey's rights because the conversation was not an interrogation, it was initiated by

28

13

1   Yancey, and no questions were asked about the murder charge.  The state court's interpretation of

2   the conversation was entirely reasonable.  As the state appellate court noted, "the *Miranda* rule

3   excludes from its scope volunteered statements of any kind.  If, after receiving a *Miranda*

4   warning, the defendant initiates a statement to the police, 'nothing in the Fifth and Fourteenth

5   Amendments . . . prohibit[s] the police from merely listening to his voluntary, volunteered

6   statements and using them against him at trial.'"  *Ellard*, 2003 WL 22183671 at *28 (quoting

7   *Edwards v. Arizona*, 451 U.S. 477, 485 (1981)).  Accordingly, "[s]tatements volunteered when

8   not in response to an interrogation are admissible against a defendant, even after an initial

9   assertion of the right to remain silent."  *People v. McDaniel*, 16 Cal. 3d 156, 172 (Cal. 1976).

10  **E.     Instructional Error on Definition of "Reasonable Doubt"**

11          Yancey claims that the trial court violated his due process rights by improperly instructing

12  the jury as to the meaning of "reasonable doubt."  During jury deliberations, the jurors asked the

13  trial court for a detailed explanation, including examples, of reasonable doubt, indicating that

14  they would like to understand the difference between reasonable and possible doubt.  While the

15  judge indicated that he could not offer much beyond that contained in the standard California

16  jury instruction, he informed the jurors that they could rely on their subjective understandings of

17  the concept of reasonable doubt.  He concluded by stating that reasonable doubt is "what you feel

18  in your conscience."  On review, the California Court of Appeal held that "[b]ased upon the . . .

19  case law, we conclude the trial court did not err by instructing the jurors in the present case to use

20  their consciences when weighing reasonable doubt."  *Ellard*, 2003 WL 22183671 at *34.

21  However, Yancey contends that this holding is contrary to, and involves an unreasonable

22  application of, clearly established Supreme Court precedent.

23          "The Due Process Clause protects the accused against conviction except upon proof

24  beyond a reasonable doubt of every fact necessary to constitute a crime with which he is

25  charged."  *In re Winship*, 397 U.S. 358, 364 (1970).   In *Jackson v. Virginia*, 443 U.S. 307, 317

26  (1979), the Supreme Court explained that "[a] 'reasonable doubt,' at a minimum, is one based

27  upon 'reason.'"  The Supreme Court clarified that any explanation of the reasonable doubt

28

                                                  14

1    standard specifically must focus on the evidence.  *Cage v. Louisiana*, 498 U.S. 39, 41 (1990)

2    (holding unconstitutional a jury instruction that "required . . . a 'moral certainty' that the

3    defendant was guilty).

4         While Yancey contends that the trial court's instruction to the jurors to use their

5    consciences when weighing reasonable doubt unconstitutionally dilutes the "beyond reasonable

6    doubt" standard of proof, the state appellate court concluded otherwise.  In support of its holding,

7    the court relied on *Davis v. United States*, in which the Supreme Court held that "[n]o man

8    should be deprived of his life under the forms of law unless the jurors who try him are able, *upon*

9    *their consciences*, to say that the evidence before them, by whomsoever adduced, is sufficient to

10   show beyond a reasonable doubt the existence of every fact necessary to constitute the crime

11   charged."  160 U.S. 469, 493 (1895) (emphasis added).  The state appellate court's determination

12   was not contrary to or involved an unreasonable application of clearly established law or was

13   based on an unreasonable determination of the facts.  To the contrary, Supreme Court precedent

14   appears to support an instruction that the jurors may rely on their consciences.  Such an

15   instruction does not divert jurors' attention from the facts of the case, nor does it mandate a

16   decision based on factors other than reason and evidence.

17                                   **III. ORDER**

18        Because the state court's determination was not contrary to, or an unreasonable

19   application of, clearly established Supreme Court precedent, nor was it based on an unreasonable

20   determination of the facts in light of the evidence presented, 28 U.S.C. § 2254(d)(1), (2), this

21   Court concludes that Yancey has failed to show any violation of his federal constitutional rights

22   in the underlying state court proceeding.  Accordingly, the petition for writ of habeas corpus will

23   be DENIED.  The Clerk shall enter judgment and close the file.

24

25   IT IS SO ORDERED.

26   DATED: April 9, 2008

27                                              _____
                                                JEREMY FOGEL
                                                United States District Judge
28

15

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
Case No. C 05-1028 JF
(JFEX2)

1   This Order has been served upon the following persons:

2   Counsel for Petitioner

3   Dennis Patrick Riordan
    dennis@Riordan-Horgan.com

4

5   Donald Meredith Horgan
    don@Riordan-Horgan.com

6   Counsel for Respondent

7   Dorian Jung
    dorian.jung@doj.ca.gov

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
Case No. C 05-1028 JF
(JFEX2)